**Virgil HEWING, Appellant,**

v.

**PETER KIEWIT & SONS and Aetna Casualty & Surety, Appellees.**

**No. 3511.**

Supreme Court of Alaska.

Nov. 9, 1978.

---

15. *See* note 4, *supra.*

R. Samuel Pestinger, Pettyjohn & Pestinger, Anchorage, for appellant.

George M. Kapolchok, Atkinson, Conway, Young, Bell & Gagnon, Anchorage, for appellees.

## OPINION

Before BOOCHEVER, Chief Justice, and RABINOWITZ, CONNOR, BURKE and MATTHEWS, Justices.

BOOCHEVER, Chief Justice.

This matter is before us on a second appeal by Hewing, contending that the Alaska Workmen's Compensation Board's award, affirmed by the superior court, inadequately compensates him for permanent disability sustained as a result of an August 5, 1969 industrial injury. Initially, the Board awarded Hewing compensation for 25 percent permanent partial disability based on a finding of "25% loss of the use of the man as a whole" and ordered a payment of $4,250.00 as lump sum compensation. We remanded for findings by the Board based on a measure of lost earning capacity rather than a measure of the purely physical injury sustained. On remand, the Board found that between June 30, 1970 and August 20, 1973, Hewing's wage earning capacity was so minimal that it could be considered to be zero. The Board, however, found that his earnings after August 20, 1973 from sales of items including used furniture and from barbecuing meat were in excess of $5,000.00 per year and thus more than $4,711.74, his highest earnings as a cement mason for any of the three years prior to his injury. The Board concluded that he had no loss of earning capacity after August 20, 1973. Hewing was therefore awarded compensation of $9,617.52 for the period to August 20, 1973. Deducted from this sum was the $4,250.00 previously paid as compensation for partial permanent disability so that on remand, the award was an additional $5,367.52.

Hewing appeals contending that he is totally permanently disabled and that his minimal earning capacity falls in the "odd lot" category not altering his 100 percent disability status.

We have concluded that the Board erred in finding that Hewing had no loss of earning capacity after August 20, 1973.

For a better understanding of the issues, we shall outline the salient facts. On August 5, 1969, Virgil Hewing, who was then 55 years old, fell about 20 feet when the floor gave way as he and 3 others were finishing cement on a Peter Kiewit construction job near Fairbanks. Mr. Hewing injured his back and fractured 2 bones in his left wrist. He filed a timely claim with the Workmen's Compensation Board; and on November 24, 1970, the Workmen's Compensation Board determined that he had "incurred a permanent partial disability equal to 25 percent loss of use of the man as a whole." That finding was challenged by a complaint for an injunction in which Mr. Hewing claimed permanent total disability. The injunction was denied by the superior court, and an appeal was taken to this court. In *Hewing v. Alaska Workmen's Compensation Board*, 512 P.2d 896 (Alaska 1973), this court concluded that the Board's findings of fact were insufficient to permit an intelligent review of the case.[1] We were concerned primarily that the Board applied an incorrect standard for determining the award, noting that unscheduled partial disability awards should be made for economic loss, not physical injury as such. We also pointed out that the availability of work in the employee's community, which he is able to perform in his injured condition, is an important determinant in establishing earning capacity. The evidence at the first

1. The Board's decision considered whether or not a penalty should be assessed against the employer for failure to make timely payment for temporary total disability, as well as the degree of permanent disability. A large portion of its decision was addressed to the penalty question.

hearing indicated that Mr. Hewing was capable of doing only light, unskilled work, and the Board was without evidence that work suited to his capabilities was regularly and continuously available in Anchorage. We remanded the case for further findings.

On August 20, 1974, prior to the determination by the Board, Mr. Hewing was driving his truck when he was hit by another motorist. He contacted his insurance company [2] to recover his medical costs and lost income as a result of the accident. In the course of two recorded interviews with the insurance adjuster, Mr. Hewing indicated that he made more than $5,000.00 in the past year selling "junk" and "barbeque." [3] He also indicated a loss of more than $3,000.00 since the automobile accident.[4]

On February 13, 1975, the Workmen's Compensation Board reheard the Hewing case pursuant to this court's remand. In arriving at its decision, the Board examined the medical records in the case as well as the recorded interview with the insurance adjuster. A deposition from an employment counselor from the Department of Labor was also introduced. The Board rendered a detailed decision, the conclusions of which we have set forth above.[5]

The medical evidence presented clearly indicated that Hewing had suffered permanent damage as a result of his industrial injury. Prior to the first hearing, Dr. Voke rated the disability at 10 percent. The discharge summary for Providence Hospital of April 21, 1970 indicated marked degenerative arthritis at three levels of the cervical spine which was believed to be secondary to

the original injury, as well as tenderness in the left hand. Dr. Harrel on September 27, 1973 found that permanent disability was 50 percent or more and that Mr. Hewing would never be able to do his regular work. On May 20, 1974, Dr. Von Wichmann wrote: "I doubt that he will be able to work as a laborer in the future because of the symptoms that he has."

Joan C. Owens, an employment counselor with the Alaska Department of Labor, testified that she did not know of any job that Hewing could do. In answer to whether she could place him in any employment, she stated:

I don't believe that I could. I really don't. He is just really badly crippled and handicapped with his lack of education, and age is a handicap also, although we like to think it's not.

■ The Board considered significant her testimony in answer to a question as to whether she believed that he was motivated to go back to work:

A No, I didn't. I felt that—that he himself felt that he was too—had been too badly injured to work, and also handicapped with his lack of education, and for twenty years, I believe it was, he worked in cement work—

Q Uh-hum.

A And obviously he couldn't do that any more.

The fact that one who is physically disabled from manual labor and is unqualified in other types of work is not motivated to seek work, is not, however, the equivalent of a physically competent person being unem-

2. The other motorist was uninsured, and Mr. Hewing carried uninsured motorist coverage.

3. The exact nature of this work is unclear. When questioned further at the 1975 hearing, Mr. Hewing explained that he bought used furniture at auctions and resold it. "Barbeque" was never defined.

4. The time lag between the interview and the accident is unclear, but it could not have exceeded 6 months because the accident occurred in August 1974, and the adjuster testified about his interview with Hewing at the February 1975 hearing.

5. The Board was aware that the doubt surrounding Mr. Hewing's earnings was due to the untrustworthiness of his own testimony. Before the Board, he downplayed his income, but he inflated it to the insurance adjuster. As the Board stated:

If applicant's testimony is to be accepted, he is permanently and totally disabled for workmen's compensation purposes but has sustained a loss of income of between $5,200 and $15,600 for the purposes of his claim for damages. Obviously both cannot be correct. We believe the truth lies somewhere in between.

ployed due to lack of motivation. For lack of motivation to be significant, there must be a showing that work is available within the employee's capabilities.

The Board in its decision determined that Hewing "has some permanent partial disability but is not permanently and totally disabled." In not awarding any compensation for the period after August 20, 1973, the Board must have concluded that the partial disability did not affect Hewing's earning capability.

The Board found that Hewing had virtually no schooling except what he was exposed to in post-injury vocational rehabilitation efforts which proved largely unsuccessful. His prior history of employment was as a cement finisher since 1957, some truck driving and farming. All of these factual findings seem to be supported by substantial evidence.

This appeal involves two questions: whether a manual laborer, with practically no education, who is no longer able to enter the manual labor market because of an industrial injury, is entitled to no compensation for loss of earning capacity because he may engage in the sale of barbeque, used furniture and other items;[6] and if he is entitled to compensation, the amount thereof.

AS 23.30.190(20), in effect at the time of Hewing's injury, provided for unscheduled permanent partial disability based on 65 percent of the difference between his pre-injury average weekly wages and his wage earning capacity after his injury in the same employment or otherwise.[7] "Wage earning capacity" is defined in AS 23.30.-210(a) as follows:

In a case of partial disability under § 190(20) or 200 of this chapter the wage-earning capacity of an injured employee is determined by his actual earnings if the actual earnings fairly and reasonably represent his wage-earning capacity. If the employee has no actual earnings or his actual earnings do not fairly and reasonably represent his wage-earning capacity, the board may, in the interest of justice, fix the wage-earning capacity which is reasonable, having due regard to the nature of his injury, the degree of physical impairment, his usual employment, and any other factors or circumstances in the case which may affect his capacity to earn wages in his disabled condition, including the effect of disability as it may naturally extend into the future.

The Board found that Hewing had actual post-injury yearly earnings in excess of $5,000.00, and, in effect, that those earnings fairly and reasonably represented his wage earning capacity. Since his earnings as a cement mason during the three years prior to the 1969 injury did not exceed $4,711.74 per year, the Board concluded that he suffered no loss in earning capacity.

■ The Board was correct in attempting to determine Hewing's loss of earning capacity rather than rating Hewing purely on physical impairment alone. It was to assure a rating based on loss of earning capacity that we remanded the case after the first appeal stating:

The availability of work in the employee's community which he can perform in his injured condition is an important determinant of earning capacity. . . . One permissible inference from these notations is that appellant was able to perform only light, unskilled work. No evidence was presented that work suited to appellant's capabilities was regularly and continuously available in his Anchorage community. Further, the Board failed to consider the availability of suitable work or to make a subsidiary finding on this factor. 512 P.2d at 900. (footnotes omitted)

Subsequently, in *Vetter v. Alaska Workmen's Compensation Board*, 524 P.2d 264, 266 (Alaska 1974), we discussed the applicable criteria as follows:

---

6. Mr. Hewing's testimony was to the effect that friends helped him load and unload his truck.

7. Ch. 193 § 7(3)(t), SLA 1959 (current version at AS 23.30.190(20)) (66⅔ percent of the difference). The Board computed compensation based on 65 percent of Hewing's wage.

The concept of disability compensation rests on the premise that the primary consideration is not medical impairment as such, but rather loss of earning capacity related to that impairment. An award for compensation must be supported by a finding that the claimant suffered a compensable disability or, more precisely, a decrease in earning capacity due to a work-connected injury or illness. Factors to be considered in making this finding include not only the extent of the injury, but also age, education, employment available in the area for persons with the capabilities in question, and intentions as to employment in the future. [footnotes omitted]

What is necessary is to compare the earnings made prior to the injury with the earnings likely to be made in the future. Normally, the comparison of post-injury earnings and those prior to the injury involves a relatively brief span of time. In Hewing's case, we are comparing earnings of 1973–74 with those of 1966–69. Where there is a substantial difference in wage levels, as there is obviously here, the post-injury earnings should be corrected to correspond with the general wage level in force at the time that pre-injury earnings were calculated,[8] or the pre-injury earnings should be recomputed at the scale in effect at the time of the post-injury earnings.

It is impossible, of course, to predict an employee's earnings in the future, but an award must nevertheless be made without waiting until the end of the employee's worklife.

The only possible solution is to make the best possible estimate of future impairment of earnings, on the strength not only of actual post-injury earnings but of any other available clues.

It is uniformly held, therefore, without regard to statutory variations in the phrasing of the test, that a finding of disability may stand even when there is evidence of some actual post-injury earnings equaling or exceeding those received before the accident. The position may be best summarized by saying that actual post-injury earnings will create a presumption of earning capacity commensurate with them, but the presumption may be rebutted by evidence independently showing incapacity or explaining away the post-injury earnings as an unreliable basis for estimating capacity. Unreliability of post-injury earnings may be due to a number of things: increase in general wage levels since the time of accident; claimant's own greater maturity or training; longer hours worked by claimant after the accident; payment of wages disproportionate to capacity out of sympathy to claimant; and the temporary and unpredictable character of post-injury earnings.

The ultimate objective of the disability test is, by discounting these variables, to determine the wage that would have been paid in the open labor market under normal employment conditions to claimant as injured, taking wage levels, hours of work, and claimant's age and state of training as of exactly the same period used for calculating actual wages earned before the injury. [footnotes omitted] [9]

In Hewing's case, in part due to his inability to express himself clearly and in part possibly due to his own cupidity, the Board was confronted with a difficult task in ascertaining the amount of post-injury earnings and whether the presumption that those earnings represented his earning capacity was rebutted. The Board should have considered the increase in general wage levels since the accident, and the possibility that Hewing's post-injury earnings were of a temporary and unpredictable nature. The testimony hardly indicated the type of permanent business or employment from which one could conclude that Hewing

8. Larson, 2 Workmen's Compensation Law § 57.32 at 10–75 (Matthew Bender 1976); *Whyte v. Industrial Commission*, 71 Ariz. 338, 227 P.2d 230 (1951); *Maxey v. Major Mechanical Contractors*, 330 A.2d 156 (Del.1974).

9. Larson, Workmen's Compensation Law § 57.-21 at 10–39 to 10–40.

will be likely to continue earning as much or more than he could before his disabling injury. Moreover, in his testimony before the Board, Hewing indicated that his earnings from sales of items were maybe $100.00 a week "gross," so that it is difficult to ascertain the amount of his net earnings.

In *Karr v. Armstrong Tire & Rubber Co.*, 216 Miss. 132, 61 So.2d 789 (1953), a somewhat similar situation was presented. At an initial hearing, an order was entered denying a partial permanent disability claim because the claimant had higher weekly earnings after injury than at the time of injury. On appeal, the state supreme court remanded for reconsideration in order to ascertain whether the higher post-injury earnings actually represented wage earning capacity when considering the general rise in wages and other factors discussed in Larson's Workmen's Compensation Law.

The Board erred in not considering such factors, including that the post-injury income was from sales of junk and barbeque rather than from employment, that there was no breakdown between gross and net income, the difference in wage levels between the two time periods and the state employment counselor's testimony as to lack of any suitable employment for Hewing because of his work-related disabilities. Thus, the Board's conclusion that there was no loss of wage earning capacity after August 20, 1973 cannot be upheld.

The "odd-lot" doctrine was applied in *J. B. Warrack Company v. Roan*, 418 P.2d 986 (Alaska 1966), where medical opinion revealed a physical impairment of between 40 and 45 percent. This court on appeal upheld a finding of total disability stating:

> For workmen's compensation purposes total disability does not necessarily mean a state of abject helplessness. It means the inability because of injuries to perform services other than those which are so limited in quality, dependability or quantity that a reasonably stable market for them does not exist. The evidence here discloses that Roan is a carpenter but is unable physically to follow that trade.

He is not qualified by education or experience to do other than odd jobs provided they are not physically taxing. As the Supreme Court of Nebraska has pointed out, the "odd job" man is a nondescript in the labor market, with whom industry has little patience and rarely hires. Work, if appellee could find any that he could do, would most likely be casual and intermittent. In these circumstances we believe the Board was justified in finding that appellee was entitled to an award for permanent total disability under the Alaska Workmen's Compensation Act. [footnote omitted] *Id.* at 988.

From the testimony, the question is presented as to whether Hewing's post-injury earnings are in the category of "odd lot" employment, and thus do not preclude a finding of permanent total disability. The term is explained in Justice Cardozo's opinion in *Jordan v. Decorative Co.*, 230 N.Y. 522, 130 N.E. 634, 635–36 (1921):

> He [the plaintiff] was an unskilled or common laborer. He coupled his request for employment with notice that the labor must be light. The applicant imposing such conditions is quickly put aside for more versatile competitors. Business has little patience with the suitor for ease and favor. He is the "odd lot" man, the "nondescript in the labor market." Work, if he gets it, is likely to be casual and intermittent. . . . Rebuff, if suffered, might reasonably be ascribed to the narrow opportunities that await the sick and halt. [footnote and citations omitted]

We are cognizant of the long delays encountered in disposing of this claim. The case has twice been appealed to us and involves a 1969 injury and a claimant now 65 years of age. One major purpose of Workmen's Compensation acts is to furnish a simple, speedy remedy for injured workers whereby they may be compensated for injuries arising out of their employment. *Johnson v. Ellamar Mining Company*, 5 Alaska 740, 741 (1917). We believe that, normally, the Alaska act works well to serve that purpose. In a case such as this,

further litigation will probably mitigate against the interests of both the insurance carrier and the employee.

Nevertheless, we find it necessary to order a remand to the Board once more for the purpose of rating Hewing's disability. Should the Board determine that Hewing is employable rather than totally disabled under the "odd-lot" doctrine, then the Board should determine his loss of earning capacity. The Board should consider all the factors outlined or referred to in this opinion on the question of Hewing's employability or wage earning capacity.[10]

We request that the Board's decision be expedited.[11]

MATTHEWS, J., dissents, with whom RABINOWITZ, J., joins.

MATTHEWS, Justice, dissenting, with whom RABINOWITZ, Justice, joins.

For the reasons expressed in the opinion of the superior court, published here as an appendix, I believe that there is substantial evidence to support the Board's decision.

## APPENDIX A

### SUPERIOR COURT DECISION ON APPEAL

Claimant, Hewing, commenced this appeal from a decision of the Alaska Workmen's Compensation Board denying him permanent total disability compensation. The matter had previously been through this court to the Alaska Supreme Court and was sent back for further findings of fact. See Hewing v. Alaska Workmen's Compensation Board, 512 P.2d 896 (Alaska 1973). The Board found that Hewing had current earnings greatly in excess of those he had prior to his injury, and consequently had not suffered a permanent earning impairment as a result of the injury.

Claimant makes two contentions on appeal. First, that given his age, education, background, and experience, he is in effect in the "odd lot" category and has no reasonable expectations of future earnings, and that consequently his occasional earnings do not bar a finding of total disability. The evidence on plaintiff's earning capacity came largely from his own statements which were substantially impeached. The Board could find, as it did, that Hewing's earnings from buying and selling used furniture and as a barbeque cook were not transient but were reasonably likely to continue at their present level in the future, and that consequently Hewing was not an "odd lot" employee. In reaching this conclusion the Board could consider the rehabilitation specialists' comments regarding Hewing's motivation to seek other work.

Claimant's second contention is that the Board's finding does not adequately take into account inflation since the time of his injury. The Board found that Hewing's earnings at the time of his injury from his occupation were roughly $4,000. It further found that his earnings at the time of the hearing were in substantial doubt due to the untrustworthiness of Hewing's testimony. At the hearing he downplayed his income from his furniture business, but in response to questions from an insurance adjuster investigating an unrelated personal injury case, he had indicated a consistent income of from $100 to $300 per week. Consequently, after evaluating Hewing's testimony, the Board concluded that his true earning potential was mid-way between the two extremes, i. e., 0 and $300 a week or roughly $150 per week. One Hundred and Fifty Dollars per week times 52

---

10. Aside from possible evidence as to wage levels, no new testimony should be required as there is an ample record from which the Board may render its decision. To determine Hewing's post-injury wage level, the Board should consider Hewing's testimony that friends helped him load and unload his truck. If this is a critical part of his post-injury earnings, the Board must evaluate how Hewing could perform this function, either working for himself or others. If he worked for himself and would likely have to hire an assistant, this would affect his wage level.

11. The Board should issue its amended decision within 30 days from the date the matter is remanded to it, unless unusual circumstances prevent such expedition.

weeks is roughly $7,800, which when compared to Hewing's pre-accident earnings of $4,000 would more than adequately cover any inflation.

The difficulty with this case lies in the fact that claimant is in the best position to testify truthfully regarding his current earnings and those activities which he can in fact perform. He has done so and given the Board reasonable grounds to doubt his credibility. Since claimant's out of court admissions are evidence which has been adequately verified, the Board could give it what weight they thought it deserved.

IT IS THEREFORE ORDERED, the decision of the Workmen's Compensation Board is affirmed.

/s/ JAMES K. SINGLETON, Jr.
JAMES K. SINGLETON, JR.
Judge of the Superior Court